**M. Christie Helmer,** OSB No. 743400
chris.helmer@millernash.com
**Ian M. Christy**, OSB No. 160116
ian.christy@millernash.com
**Edward T. Decker**, OSB No. 196413
edward.decker@millernash.com
MILLER NASH GRAHAM & DUNN LLP
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon  97204
Telephone:  503.224.5858
Facsimile:  503.224.0155

      Attorneys for Petitioner


UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| METRO METALS NORTHWEST, INC., an Oregon corporation | No. |
| Petitioner, | PETITION TO COMPEL ARBITRATION |
| v. | |
| MUGHAL IRON & STEEL INDUSTRIES LIMITED, a business entity organized under the laws of Pakistan, | |
| Respondent. | |

For its claim against respondent Mughal Iron & Steel Industries Limited

("Mughal Steel"), petitioner Metro Metals Northwest, Inc. ("Metro Metals") alleges as follows:


Page 1 –    PETITION TO COMPEL ARBITRATION

## I.  PARTIES

1.        Metro Metals is a corporation organized and existing under the laws of the state of Oregon with its principal place of business in Portland, Oregon.  Metro Metals is a reseller of bulk scrap metal, both to customers in the United States and customers abroad.

2.        On information and belief, Mughal Steel is a public limited company formed under the laws of Pakistan with a principal place of business in Lahore, Pakistan. Mughal Steel operates in the long-rolled steel industry, manufacturing products such as steel rebar, girders, and t-iron from recycled and other metals.

## II.  JURISDICTION AND VENUE

3.        Based on §§ 4, 5, and 206 of the Federal Arbitration Act, 9 U.S.C. § 1, *et. seq.*, ("FAA"), Metro Metals brings this claim against Mughal Steel to require referral of one or more sales contract disputes between Metro Metals and Mughal Steel to arbitration.  This Court has jurisdiction over this action under 9 U.S.C. § 203 because the United States, where Metro Metals resides, and Pakistan, where Mughal Steel resides, are parties to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention"), and the dispute between the parties described below is a commercial dispute falling within the ambit of the New York Convention.

4.        Venue is proper in this judicial district under 9 U.S.C. § 204, as the courts of Oregon would have jurisdiction over the dispute were it not for applicability of the arbitration clause in the parties' contract.

## III.  FACTS

5.        On or about February 24, 2020, Metro Metals and Mughal Steel entered into a contract under which Metro Metals agreed to sell and Mughal Steel agreed to buy approximately 30,000 metric tons of scrap steel for the price of USD 9,170,000 ("Sales Contract," a copy of which is attached to this Petition as Exhibit 1).

Page 2 –     PETITION TO COMPEL ARBITRATION

6.      Metro Metals asserts Mughal Steel repudiated or breached the Sales Contract when it wrongfully declared "force majeure" and refused to accept or pay for the steel scrap sold.   Mughal Steel's actions caused Metro Metals at least $2 million in damages.

7.      Paragraph 20 of the Sales Contract contains the following arbitration clause:

> Any disputes, controversies and/or claims arising out of or relating to this agreement or any modification thereto, or any alleged breach or cancellation thereof, which cannot be settled amicable [sic] between Buyer and Seller, shall be settled by arbitration in the USA, in accordance with the laws/regulations/stipulations.

8.      The Sales Contract does not specify an arbitrator before whom any dispute would be resolved, a procedure for appointing an arbitrator, or a set of arbitration rules pursuant to which arbitration is to be conducted.

9.      Metro Metals asked Mughal Steel to agree on a set of rules by which to conduct arbitration of the dispute as well as a locale for the arbitration and one or more arbitrators.  While it initially engaged on that subject, Mughal Steel has now refused to engage further, and, effectively, refuses to arbitrate the parties' dispute.

## IV.  CLAIM FOR RELIEF

10.      Under the FAA, courts are to compel arbitration where the parties have a written arbitration agreement, the parties' dispute is within the scope of the arbitration agreement, and the responding party has failed to comply with the arbitration agreement. 9 U.S.C. §§ 4, 206.  The Sales Contract contains a written arbitration clause that includes in its scope all disputes, controversies, and/or claims arising out of the Sales Contract.  Metro Metals' claim against Mughal Steel arises under the Sales Contract and is subject to arbitration.

11.      If an arbitration agreement does not provide a method for naming or appointing an arbitrator, Sections 5 and 206 of the FAA empower courts to appoint an arbitrator to decide the parties' dispute.  The Sales Contract does not specify a method for naming or

Page 3 –    PETITION TO COMPEL ARBITRATION

appointing an arbitrator, nor does it set the stage for arbitration by naming a set of rules pursuant to which the arbitration shall be conducted and the opposing party notified of the arbitration claim.

           12.     Thomas J. Brewer has been a practicing attorney since 1975 and has acted full-time as an arbitrator since 2000, arbitrating claims under the International Arbitration Rules of the International Centre for Dispute Resolution ("ICDR," the international disputes arm of the American Arbitration Association) and other recognized international arbitral rules.  He is a Fellow in the College of Commercial Arbitrators and the Chartered Institute of Arbitrators and is ranked in Chambers USA in the category of International Arbitration.  Mr. Brewer specializes in international and domestic commercial arbitrations, including arbitration of disputes like the described dispute between Metro Metals and Mughal Steel.  A copy of his curriculum vitae is attached to this petition as Exhibit 2.  Mr. Brewer would be an appropriate person for the Court to appoint as arbitrator for disputes under the parties' Sales Contract, and the International Arbitration Rules of the ICDR would be appropriate rules for the Court to adopt as rules to govern the arbitration and its initiation before Mr. Brewer.  Mr. Brewer states he has no conflict and is willing to act as arbitrator under the parties' Sales Contract.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Page 4 –    PETITION TO COMPEL ARBITRATION

**WHEREFORE,** Metro Metals prays that this Court:

1.      Refer the parties to Thomas J. Brewer for arbitration of disputes under the Sales Contract, including the dispute described in this petition, under the International Arbitration Rules of the International Centre for Dispute Resolution;

2.      Award Metro Metals such other relief as this court deems just and proper.

DATED:  August 25, 2020.

MILLER NASH GRAHAM & DUNN LLP


    s/ M. Christie Helmer
M. Christie Helmer, OSB No. 743400
chris.helmer@millernash.com
Ian M. Christy, OSB No. 160116
ian.christy@millernash.com
Edward T. Decker, OSB No. 196413
edward.decker@millernash.com

Attorneys for Petitioner

**METRO METALS NORTHWEST, INC.**
5611 NE COLUMBIA BLVD
PORTLAND, OR 97218 USA

PHONE: 503-287-8861
FAX: 503-287-5569



**METROMETALS**
NORTHWEST,INC

# SALES CONTRACT

DATE: FEBRUARY 24, 2020          CONTRACT NO. MISG0320

This contract is made by and between the Buyer, Mughal Iron & Steel Group of
Industries Limited. 31A Shadman 1, Lahore, Pakistan and Metro Metals Northwest, Inc.
5611 NE Columbia Blvd., Portland, OR 97218 USA Tel. 503-287-8861 Fax. 503-287-
5569, as the Seller, whereby the Buyer agrees to buy and the Seller agrees to sell one
cargo of steel scrap on the terms and conditions stated below:

1.  Name of Commodity:

    Ferrous Scrap - Iron and Steel Scrap for Melting

2.  Composition:

    Shredded Scrap as per ISRI 211 with minimum density of 70lbs./cu.ft. and total
    copper content of 0.25% max
    PNS (Plate and Structural Scrap) as per ISRI 231-232     H.S. Code: 7204.4100
                                                                          7204.4990
3.  Total Quantity:

    Total 30,000 MT with 5% more or 5% less allowed at Seller's option, but also subject
    to the draft limitation at Karachi, Pakistan

    Shredded Scrap 26,000 MT +5%/-5%

    PNS 4,000 MT +5%/-5%

4.  Country of Origin:

    U.S.A.

5.  Opening Bank:

    Tier 1 Bank at Pakistan. Tier 2 on approval of seller

    S.W.I.F.T. authentication with U.S. Bank NA required

6.  Unit Price:

    <u>On sight Basis-</u>

    Shredded Scrap $305 USD per MT

    PNS $310 USD per MT



1/5

Exhibit 1
Page 1 of 5

Price CFR Free Out One safe berth in one safe port of Karachi, Pakistan

$9,170,000 USD nine million one hundred seventy thousand with 5% more or 5% less allowed.

7. Time of Shipment:

From U.S.A. latest March 31, 2020

8. Supplier:

Scrap under this contract will be supplied by Metro Metals Northwest, Inc.

9. Port of Loading:

Vancouver, WA USA

10. Port of Destination:

Karachi, Pakistan

11. Insurance:

To be covered by the buyer

12. Payment:

The Buyer, Mughal Iron & Steel Group of Industries Limited shall open irrevocable, non-transferable Letter(s) of Credit (L/C) in favor of the Seller, Metro Metals Northwest, Inc. 5611 NE Columbia Blvd., Portland, OR 97218 USA. The L/C(s) is/are to be payable for 100% of the cargo value against the presentation of the shipment documents as per clause 13.

LC draft(s) application approval by seller required prior to issuing bank submission

L/C(s) being opened and in fully workable condition by latest March 6, 2020.

The L/C(s) shall be valid until the 21st day after the latest shipment date.

All banking charges incurred outside of ~~Singapore~~ Pakistan to be borne by the Seller.

(Special Instructions in L/C)
1) 5 percent more or 5 percent less for quantity and amount shall be allowed.
2) Charter Party Bills of Lading shall be allowed and marked "Freight Payable as per Charter Party".
3) L/C Latest Shipment Date: March 31, 2020
4) L/C Validity Date: April 21, 2020
5) T/T Reimbursement allowed USA Bank at request and cost to Beneficiary
6) Non-transferable irrevocable letter of credit required
7) Advise via authenticated SWIFT or tested Telex directly to:
    U.S. Bank National Association
    Portland International Banking Office
    111 SW Fifth Avenue, Suite 500
    Portland, Oregon 97204 U.S.A.
    Phone: (503) 275-6059 Toll Free: (866) 359-2503 Fax: (503) 275-5132

Exhibit 1
Page 2 of 5

SWIFT: USBKUS44PDX  Telex: 192179 USB INTL MPS

    8) LC confirmation may be added at request and cost to Beneficiary.

13. Shipping Documents:

The following documents shall be presented for negotiation:

1) Full set of original "on board" Charter Party Bills of Lading marked "Freight payable as per Charter Party", ~~and not required to show L/C Number.~~
   a. Number of B/L's and B/L instructions must be final and advised to seller prior to vessel berthing and loading at Vancouver, WA USA.
2) Commercial Invoice indicating contract number; name of carrying vessel; letter of credit number; description of goods; and quantities shipped.
3) Certificate of Weight issued by independent surveyor Specialized Marine Inspections, LLC for survey performed at the loading port.
4) Certificate of Quality issued by independent surveyor Specialized Marine Inspections, LLC for survey performed at the loading port.
5) Draft Survey Report issued by independent surveyor Specialized Marine Inspections, LLC for survey preformed at the loading port.
6) Certificate of Origin issued by the seller.
7) Stowage Plan
8) Charter Party Copy and not required to show ~~L/C number or~~ original signatures.
9) Seller's Certificate of Non-Wood materials.

14. Determination of Weight:

The Draft Survey at the loading port is to be performed by independent surveyor Specialized Marine Inspections, LLC at Seller's account, whilst the draft survey at the discharging port is to be performed by independent surveyor of the Buyer's choice at Buyer's account.

The Seller has a right to send Seller's check surveyor of Draft weight at discharging port at the Seller's account.

If the Draft Survey weight at the discharge port, as mentioned above, is within tolerance, up or down, to the Draft Survey Weight at the loading port, then no adjustment is to be made, and the draft weight at the loading port shall be deemed as the final weight.

If the Draft Survey weight at the discharge port, as mentioned above, reflects a shortage or overage exceeding the 0.5% tolerance to the Draft Survey weight at the loading port, then any shortage or overage exceeding said 0.5% tolerance shall be reimbursed to the Buyer or Seller, whichever the case may be.

The results of the discharge port Draft Survey performed by Buyer's chosen independent surveyor are to be reported to the Seller within 30 days after completion of discharge.  If the results are not reported within the time allowed, the loadport Draft Survey results will stand as the final weight.

15. Determination of Quality:

3/5

Exhibit 1
Page 3 of 5

Certificate of Quality including the amount of dust, dirt, impurities and cast iron is to be issued by Specialized Marine Inspections, LLC, at the loading port is to be final and binding on both parties. Inspection fee at loading port is for Seller's account. Buyer's representative and/or Buyer's check surveyor may at any time during the loading of the cargo attend at the yard of shipment and inspect the cargo. Certificate shall certify that the cargo does not container any type of arms, ammunitions, explosive and radioactive materials.

Buyer's representative and/or buyer's surveyor may attend at any time during loading of shipment and inspect cargo.

16. Impurities:

Impurities such as rubber, dust, dirt, non-ferrous, and any other non-metallics are allowed with a tolerance of up to 1% against B/L weight. Maximum allowed for cast iron is 4%. Impurities exceeding allowances, if any, and as determined at the discharging port by Buyer's independent surveyor shall be deducted from the final weight. However, if Seller does not agree with the aforementioned report, then the average figure between seller's independent surveyor at loading port and Buyer's independent surveyor at the discharging port for impurities shall be considered as final.

17. Discharging Terms and Conditions:

The Seller is to ship by a single deck bulk carrier up to 25 years old, geared with minimum 4 holds/hatches and minimum 4x25 MT cranes in good working condition and electricity provided by the vessel. All vessel shifting costs at discharge port are for the Buyer's account.

Discharge Rate-

The Buyer agrees to discharge at the rate of 4,000 MT for Shredded Scrap and 2,500 MT for PNS scrap, per weather working day of 24 hours, Saturdays, Sundays and Holidays included.

Notice of Readiness (NOR) is to be tendered during office hours Monday through Friday 8:00AM to 5:00PM, and Saturday 8:00 AM to 12:00 PM, whether vessel in berth or not, whether in free-pratique or not, whether customs cleared or not.

Laytime to commence 2:00PM if NOR duly tendered before noon, and 08:00 AM next working day if NOR duly tendered during afternoon office hours. All other discharged terms and conditions are to be as per the governing Charter Party Conditions.

Demurrage/dispatch money is to be finalized basis the statement of facts signed by the ship's master and/or chief officer. The Buyer is responsible to obtain such signed statement of facts and send to the Seller by courier service (i.e. DHL, OCS, or other overnight courier service) within 7 days after completion of discharging of the cargo. If the Buyer fails to send statement of facts provided to the Seller by the Ship owner directly, the Buyer shall be bound by this statement of facts.

4/5

Exhibit 1
Page 4 of 5

18. Terms of CFR Delivery:

The Seller shall undertake to ship the contracted goods from the port(s) of loading to the port of destination with no transshipment allowed. The contracted goods shall not be carried by a vessel flying the flag of countries which the Buyer cannot accept.

19. Force Majeure:

Force Majeure, as used herein, shall mean a cause or causes beyond the will or control of the any of the parties to this contract as the case may be, which wholly or in part, prevents the delivery of the commodity to be purchased and sold hereunder. Examples of Force Majeure are the following:

Acts of God, insurrections, blockage of the loading port and/or the discharge port, declared or undeclared war, riots, strikes, lockouts, breakdown of or damages to or destruction of installations and/or machinery and/or plant, fires, accidents, epidemics, floods, natural or man-made disasters, actions and/or restriction of government (or agencies there-of), or any like contingency beyond the reasonable control of Seller or Buyer.

If, because of Force Majeure, any party or parties to this agreement are unable to carry out their obligations, and if such party or parties immediately gives the other parties hereto written notices of such Force Majeure, then the obligations and liabilities of the party or Parties giving such notice shall be relieved, but after the expiration sixty (60) days, the party not claiming excuse under this provision may cancel the contract.

20. Arbitration:

Any disputes, controversies and/or claims arising out of or relating to this agreement or any modification thereto, or any alleged breach or cancellation thereof, which cannot be settled amicable between Buyer and Seller, shall be settled by arbitration in the USA, in accordance with the laws/regulations/stipulations.


The Buyer:
Mughal Iron & Steel Group of Industries Limited.

_____ Date

The Seller:
Metro Metals Northwest, Inc.

2-24-20

Victor Winkler                    Date
CEO – President

5/5

Exhibit 1
Page 5 of 5

# T H O M A S  J.  B R E W E R
## A R B I T R A T O R

| | |
|---|---|
| **The Millennium Building**<br>**719 2nd Avenue, Suite 1150**<br>**Seattle, WA 98104**<br>**T:  +1 206 780 5037** | **Email:**  tjbrewer@tjbrewer.com<br>**Website:**  www.tjbrewer.com<br>**Facsimile: + 1 206 780 3945** |

## R E S U M E

**Profession**:

Independent arbitrator specializing in international and domestic commercial arbitrations.

**Arbitration Experience**:

Arbitration experience includes both domestic and international commercial arbitrations, with over 350 appointments as panel chair, neutral panelist arbitrator or sole arbitrator since becoming a full-time neutral in 2000.  The cases have ranged from complex, multi-party business disputes with large amounts in controversy to a wide variety of other matters, of varying size, involving corporations, privately-held companies, LLC's, partnerships, joint ventures, governmental entities and individuals.  Prior cases have included a wide range of business and commercial disputes, principally in the following areas:

**BUSINESS AND COMMERCIAL:**  Commercial contracts, sale of business/asset purchase, corporate governance and disputes between business co-owners, product development and licensing, insurance, international trade, commercial real estate and many other kinds of business agreements and transactions.  Member of the ICDR's International Roster of arbitrators, the AAA's Commercial and Large, Complex Case panels, and of the CPR Institute's Cross-Border, National Panel of Distinguished Neutrals and Commercial Real Estate panels of arbitrators. Examples of specific prior cases include:

- A domestic arbitration between a professional athlete and a manufacturer of athletic clothing and footwear arising out of an international licensing and promotional agreement (Panel Chair).
- A dispute between a Class I railroad and eleven short lines over interpretation of the rate provisions in their freight operating agreements (Neutral Panelist).
- An international arbitration between British, Israeli and U.S. investors in a commercial real estate project related to alleged breaches of the parties' development agreements, fiduciary duties and capital call obligations (Neutral Panelist).

Exhibit 2<br>Page 1 of 6

Page 2

- A dispute between Alaska Regional Corporations over whether certain revenues must be shared pursuant to the requirements of the Alaska Native Claims Settlement Act (Panel Chair).
- A contract dispute between a Texas tank farm and an international customer over billings following a fire and invocation of a *force majeure* clause (Neutral Panelist).
- An employment-termination dispute between a major league baseball team and one of its former management employees (Sole Arbitrator).
- An antitrust dispute between a large U.S. national retailer and a Japanese manufacturer of flat screen technology products relating to damages allegedly caused by a horizontal price-fixing conspiracy (Sole Arbitrator).
- An international arbitration between U.S. and Korean parties alleging breaches of long-term international supply contracts for zinc concentrates (Panel Chair).
- An international arbitration of a franchising dispute between parties from India and the U.S. (Sole Arbitrator).
- A commercial real estate arbitration involving decennial rent re-set appraisal and valuation issues related to the biotech campus buildings of a large U.S. medical school (Neutral Panelist).
- Additional examples available at www.tjbrewer.com.

**ENERGY, OIL & GAS, ELECTRIC POWER:**   Oil and gas arbitrations have included participation agreement, area of mutual interest, marketing and trading, pipeline, refinery, natural gas gathering, treating, processing, transport and sales, contract interpretation, royalty, production curtailment, joint venture, petrochemical, sale of business and valuation disputes.   Electricity arbitrations have included numerous power purchase agreements, tolling, transmission, joint operating, co-generation, PURPA, ISO/RTO, contract interpretation, wind, solar and photovoltaic projects, biomass, steam supply, project development and other types of disputes and agreements.   Member of the ICDR's International Energy Arbitrators List, the AAA's National Energy panel, and of the CPR Institute's Energy, Oil & Gas panel of arbitrators.   Examples or prior cases include:

- An international arbitration between co-owners of a 100,000 barrel/day Texas oil and gas refinery and related trading entity arising out of a corporate governance dispute, resulting exercise of one owner's "put" rights and valuation of the refinery (Panel Chair).
- A domestic energy arbitration involving claims for royalty income damages arising out of production curtailments and pipeline replacements in a large U.S. oil field (Panel Chair).
- An arbitration between parties to an electric power tolling agreement involving claims for recovery of winter reliability penalties imposed by the New England ISO and counterclaims alleging miscalculation of availability charges (Panel Chair).
- An energy arbitration between an RTO and a transmission customer over alleged breaches of a service agreement (Panel Chair).
- A domestic energy arbitration between parties to an oil and gas participation agreement over interpretation and implementation of an "area of mutual interest" provision (Neutral Panelist).

Exhibit 2
Page 2 of 6

Page 3

- An energy arbitration over interpretation of the price term in a long-term gas purchase contract (Panel Chair).
- An energy arbitration involving alleged breaches of an agreement providing for development and financing of solar electric power projects for a California city (Neutral Panelist).
- A wind energy dispute between the owner of a 5,000+ acre wind power generation project and a large public utility over alleged curtailment losses arising under a long-term power purchase agreement (Panel Chair).
- A dispute between a California city and the owner of a gas-fired power plant involving disputes arising under a power purchase tolling agreement, and under a related interconnection and transmission services agreement (Sole Arbitrator).
- A domestic energy arbitration between a coal-fired electric power generating plant and a utility over interpretation of the pricing provisions in a long-term (30 year) power purchase agreement (Panel Chair).
- Additional examples available at www.tjbrewer.com.

**TECHNOLOGY/INTELLECTUAL PROPERTY:**  IP and technology arbitrations have included patent, royalty, product development and licensing disputes related to semiconductor, pharmaceutical, medical product, vaccine, telecom and other technologies, trade secret misappropriation and Lanham Act disputes, copyright, software and business acquisition-related IP disputes. Member of the AAA's Intellectual Property and of the CPR Institute's Health Care and Life Sciences panels of arbitrators.  Member of the Silicon Valley Arbitration & Mediation Center's Tech List of leading arbitrators and mediators in the technology sector (2020 and prior years).  Examples of prior cases include:

- A domestic patent licensing and product development dispute relating to development of a vaccine (Panel Chair).
- An international arbitration related to patent licensing and product development agreements for technologies used in e-readers (Panel Chair).
- A trade secret arbitration involving alleged misappropriation of a hedge fund's financial modelling technologies by two former employees who started a competing fund (Neutral Panelist).
- An international biotech arbitration between US and Swiss parties related to alleged breaches of a licensing agreement covering certain genotypes sold for use in a test kit for human papillomavirus (Neutral Panelist).
- An international arbitration between U.S. and Dutch parties of a trade secret, breach of contract and RICO dispute between competing manufacturers of an environmental remediation product (Neutral Panelist).
- An international pharmaceutical licensing dispute between U.S. and Canadian parties (Panel Chair).
- A patent arbitration relating to "winglets" used on certain commercial airliners (Neutral Panelist).
- An international arbitration involving a pharmaceutical licensing dispute between U.S. and Indian parties (Panel Chair).

Exhibit 2
Page 3 of 6

Page 4

- An international arbitration between a U.S. seller and a Japanese buyer over alleged breaches of an asset purchase agreement for a nanocrystal technology business (Sole Arbitrator).
- Additional examples available at www.tjbrewer.com.

**LLC, M&A and JOINT VENTURES:**   Substantial experience in arbitrations involving disputes between investors and business co-owners, including LLC members, M&A, joint operating and joint venture agreements, asset purchase, representations and warranties, post-closing purchase price and escrow adjustments, earnout provisions, tax-related acquisition disputes and non-competition disputes.   Member of the AAA's M&A and Joint Ventures panel of arbitrators. Examples of prior cases include:

- An international M & A arbitration between European and U.S. parties arising out of the sale of a software company involving alleged breaches of representations and warranties given by the sellers related to balance sheet and tax liabilities (Neutral Panelist).
- An accounting-related dispute between members of an LLC that operated a gold mine in Alaska (Neutral Panelist).
- An arbitration between owners of an East Coast marine fuel terminal involving claims of breach of fiduciary duties by the LLC's Managing Member (Panel Chair).
- An international arbitration between a US software company and its Saudi Arabian joint venture partner (Panel Chair).
- An arbitration between two telecommunications companies arising out of an asset sale (Sole Arbitrator).
- Additional examples available at www.tjbrewer.com.

**OTHER:**  Arbitration experience also includes numerous construction cases, ERISA multiemployer pension plan withdrawal liability disputes, class action and Fair Labor Standards Act (FLSA) collective arbitrations, insurance coverage, healthcare payor-provider reimbursement disputes, service as an ICDR Article 37 emergency arbitrator, and many other types of commercial cases.  Member of the AAA/ICDR's Aviation, Aerospace and National Security panel of arbitrators to handle high-value defense, cyber and security-related disputes in the aerospace, aviation and national security sectors.  Substantial prior experience in arbitrations involving aviation, aerospace, software, railroad and government-related disputes.  Examples include:

- A government-contracting dispute related to satellite bandwidth used for U.S. military applications (Sole Arbitrator).
- An international arbitration between a U.S. aircraft manufacturer and a European customer involving breach of warranty claims (Panel Chair).
- An international arbitration between Israeli and Chinese parties over licensing and development for civilian applications of a technology product originally developed for military applications by the Israeli Air Force (Neutral Panelist).
- An international arbitration relating to interpretation of the royalty provision in a software licensing agreement covering a GPS product sold to the commercial aviation industry (Neutral Panelist).

Exhibit 2
Page 4 of 6

Page 5

- An international arbitration between US and Canadian railroads to set fair-market rental car-hire rates for use of a fleet of 73-foot centerbeam flatcars (Sole Arbitrator).
- A domestic arbitration between an airline providing charter aircraft services and a logistics services provider over alleged wrongful termination of an aircraft services contract for cargo transport aircraft (Sole Arbitrator).
- An international arbitration between a U.S. airline and three European airlines over interpretation of revenue sharing agreements following a merger involving one of the original contracting parties (Neutral Panelist).
- An indemnification and breach of contract dispute between a U.S. airline and a service provider arising out of a service agreement under which the provider agreed to provide wheelchair-assistance services to inbound and outbound passengers at a U.S. airport (Sole Arbitrator).
- Additional examples available at www.tjbrewer.com.

**Education**:

Dartmouth College (B.A., Government, magna cum laude, 1968); Oxford University (B.A., Jurisprudence, First Class Honours, Wronker and Jurisprudence Prizes, Rhodes Scholar, 1973); Harvard Law School (J.D., magna cum laude, law review, 1975).

**Awards and Honors:**

Listed in *Best Lawyers in America* for arbitration, 2020 and prior years.  Selected by *Best Lawyers* as Lawyer of the Year for arbitration in Seattle in 2015, 2017 and again for 2019.  Fellow, College of Commercial Arbitrators.  Fellow, Chartered Institute of Arbitrators (FCIArb).   Listed in *Who's Who Legal: Arbitration*, 2019 and prior years (*WWL* comment: "'superlative' and was particularly picked out for his expertise relating to IP disputes and energy cases").  Ranked in Chambers USA (2020) in the category of International Arbitration: Arbitrators USA ("an excellent arbitrator" with "good case management skills" who is "particularly adept at handling disputes involving IP"). Listed in *Washington Super Lawyers*, 2003-2020.

**Work History:**

Self-employed full-time neutral since 2000.  Trial lawyer 1975-2000.  Experience serving as an arbitrator, court-appointed special master, and mediator in commercial cases since 1986. Partner, Wickwire Greene Crosby Brewer & Seward, 1994-2000; Partner (1981-94) and Associate (1975-81) Heller Ehrman White & McAuliffe, (including predecessor firm acquired by merger).

**Publications and Speaking Engagements:**

Speaker, 2017 National Energy Arbitration Conference: "Resolving Energy Arbitrations in Times of Crisis," CIArb, Houston; Contributing Author, THE COLLEGE OF COMMERCIAL ARBITRATORS GUIDE TO BEST PRACTICES IN COMMERCIAL ARBITRATION,  4th ed., Juris Net 2017 (and to the three prior editions); Speaker, 2016 AAA/ICDR National Panel Conference, "Red Flags and Risk

Exhibit 2
Page 5 of 6

Page 6

Areas for Arbitrators: A Review of Recent Cases Challenging Arbitrator Authority," New Orleans, 2016; Speaker, AAA Seminar:  "Arbitration Advocacy for Courtroom Lawyers:  Two Experienced Arbitrators Discuss What Works, and What Doesn't, in Arbitration," Denver, 2015; Contributing Author, THE LEADING PRACTITIONERS' GUIDE TO INTERNATIONAL OIL & GAS ARBITRATIONS, (Juris, Gaitis ed., 2015); (partial Listing.)

**Additional Information:**

Additional information, and a printable CV, are available at www.tjbrewer.com.

(Last Updated:  February 2020)

Exhibit 2
Page 6 of 6